# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 20-60241-CIV-ALTMAN

**ALICIA ETHER**,

    *Petitioner,*

*v.*

**RICKY D. DIXON, SECRETARY,**
**DEPARTMENT OF CORRECTIONS**,

    *Respondent.*[1]

_____/

## ORDER

The Petitioner, Alicia Ether, has filed this *pro se* Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging her state-court conviction and sentence. *See* Petition [ECF No. 1]. After careful review, we **DENY** the Petition on its merits.

### THE FACTS

The State of Florida charged Ether by Information with one count of grand theft of $100,000.00 or more, in violation of FLA. STAT. § 812.014(2)(a). *See* Information [ECF No. 9-1] at 8. The Information alleged that Ether "unlawfully and knowingly obtain[ed] or use[d], or endeavor[ed] to obtain or use," over $100,000.00 that belonged to John Douglas "Doug" Jones and his company, "Doug Jones and Company" d/b/a Sixth Star Marketing and Entertainment ("Sixth Star"). *Id.* On January 23, 2017, a jury found Ether guilty, *see* Verdict [ECF No. 9-1] at 11, and the judge sentenced her to 25 years in prison, *see* Judgment and Sentence Orders [ECF No. 9-1] at 13–19.

---

[1] The original Respondent in this case, Mark Inch, retired from his position as Secretary of the Florida Department of Corrections on November 19, 2021. Former Secretary Inch's successor, Ricky D. Dixon, has been automatically substituted as the Respondent. *See* FED. R. CIV. P. 25(d) ("An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party.").

Ether, through counsel, appealed her conviction and sentence to Florida's Fourth District Court of Appeal. *See* First Notice of Appeal [ECF No. 9-1] at 25. In that appeal, Ether raised only one argument—that the trial court erred by allowing Nora Welz and Shawna Deyo, two lay witnesses who "conducted an internal audit investigation [of Sixth Star]," to "testify as to what they believed [after] the investigation concluded." Direct Appeal Initial Brief [ECF No. 9-1] at 47–51. On April 12, 2018, the Fourth DCA summarily affirmed Ether's conviction and sentence in an unwritten opinion. *See Ether v. State*, 243 So. 3d 392, 392 (Fla. 4th DCA 2018). The Fourth DCA issued its mandate on May 11, 2018. *See* Direct Appeal Mandate [ECF No. 9-1] at 76.

On January 17, 2019,[2] Ether filed a motion for postconviction relief in state court under FLA. R. CRIM. P. 3.850. *See* Postconviction Motion [ECF No. 9-1]. The Postconviction Motion advanced the following twelve grounds for relief: (1) "[trial counsel] was ineffective when he failed to preserve relevant evidence which was favorable to the defendant," *id.* at 82; (2) "[trial counsel] was ineffective when he refused to uphold defendant's Sixth Amendment right to speedy trial," *id.* at 84; (3) "[trial counsel] was ineffective in refusing a plea offer without consulting the defendant," *id.* at 86; (4) "[trial counsel] was ineffective in failing to appeal to [the Fourth DCA] when the defendant was denied pre-trial release," *id.* at 87; (5) "[trial counsel] was ineffective in failing to obtain clarification of the legal name of the defendant's accusers . . . . [which] denied the defendant her constitutional right to be confronted with the witnesses against her," *id.* at 89; (6) "[trial counsel] was ineffective in failing to preserve two (2) computer flash drives containing evidence compiled by the defendant which would contradict the State's version of the facts," *id.* at 91; (7) "[trial counsel] was ineffective for failing to object to the State's use of giant neon yellow ledger board as a demonstrative aid," *id.* at 92; (8) "[trial

---

[2] "Under the 'prison mailbox rule,' a *pro se* prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing." *Williams v. McNeil*, 557 F.3d 1287, 1290 n.2 (11th Cir. 2009). "Absent evidence to the contrary, [courts] assume that a prisoner delivered a filing to prison authorities on the date that he signed it." *Jeffries v. United States*, 748 F.3d 1310, 1314 (11th Cir. 2014).

counsel] was ineffective in failing to properly object to the admission of the State's summary of allegedly stolen items," *id.* at 93; (9) "[trial counsel] was ineffective in failing to impeach witnesses [Shawna Deyo and Doug Jones] with inconsistent testimony," *id.* at 95–96; (10) "[trial counsel] was ineffective as his [closing argument] pled [sic] the defendant guilty to the jury," *id.* at 100; (11) "[trial counsel] was ineffective for failing to object to the prosecution's use of improper tactics," *id.* at 101; and (12) "[trial counsel] was ineffective for failing to recuse the judge whose bias made the trial fundamentally unfair," *id.* at 105.

The State filed a Response to the Postconviction Motion on March 22, 2019. *See generally* State's Postconviction Response [ECF No. 9-1] at 118–44. The State urged the state postconviction court to deny the Postconviction Motion because (the State maintained) (1) "the defendant failed to demonstrate counsels were deficient and [that] she was prejudiced," and (2) the Postconviction Motion "is conclusively refuted by the record and the law." *Id.* at 143–44. On March 25, 2019, the state postconviction court adopted the State's Postconviction Response *in its entirety* and summarily denied the Postconviction Motion. *See* Order Denying Postconviction Motion [ECF No. 9-1] at 146 ("ORDERED AND ADJUDGED that the said Motion is hereby DENIED based upon the attached State Response.").

Ether subsequently appealed the denial of her Postconviction Motion to the Fourth DCA. *See* Second Notice of Appeal [ECF No. 9-1] at 150. On appeal, she argued that the lower court had erred in denying all twelve of the grounds she'd presented in her Postconviction Motion. *See* Postconviction Initial Brief [ECF No. 9-1] at 195 ("The appellant's claims are legally sufficient and not conclusively refuted."). The Fourth DCA affirmed again in an unwritten opinion. *See Ether v. State*, 285 So. 3d 315, 316 (Fla. 4th DCA 2019). The Fourth DCA's mandate issued on December 6, 2019. *See* Postconviction Appeal Mandate [ECF No. 9-1] at 201. Ether filed this Petition on January 31, 2020. *See generally* Petition.

**THE LAW**

## I.     The Antiterrorism and Effective Death Penalty Act ("AEDPA")

AEDPA instructs district courts to deny any claim that was "adjudicated on the merits" in a state-court proceeding unless that adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (summarizing 28 U.S.C. § 2254(d)–(e)). To have "adjudicated [the claim] on the merits," the state court need not have issued any kind of formal opinion or even outlined its reasoning. *Id.* at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Rather, when a state court doesn't articulate its reasons for the denial, the federal court must "'look through' the unexplained decision to the last related state-court decision that does provide a rationale" and "then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). "Clearly established Federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme Court's] decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). To be "contrary to clearly established federal law, the state court must either (1) apply a rule that contradicts the governing law set forth by Supreme Court case law, or (2) reach a different result from the Supreme Court when faced with materially indistinguishable facts." *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (cleaned up).

For "a state court's application of [Supreme Court] precedent" to be "'unreasonable, the state court's decision must have been more than incorrect or erroneous. The state court's application must have been objectively unreasonable." *Wiggins v. Smith*, 539 U.S. 510, 520–21 (2003) (cleaned up). "[I]t

is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Richter*, 562 U.S. at 101. "And an unreasonable application of those holdings must be objectively unreasonable, not merely wrong; even clear error will not suffice. To satisfy this high bar, a habeas petitioner is required to show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Woods v. Donald*, 575 U.S. 312, 316 (2015) (cleaned up).

Section 2254(d) similarly prohibits federal judges from reevaluating a state court's factual findings unless those findings were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). To establish that a state court's factual findings were unreasonable, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward*, 592 F.3d at 1155–56 (quoting 28 U.S.C. § 2254(e)(1)).

"AEDPA's standard is intentionally difficult to meet." *Woods*, 575 U.S. at 315 (cleaned up). When reviewing state criminal convictions on collateral review, "federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id.* at 316 (quotation marks omitted).

## II.     AEDPA's Procedural Requirements

"[A] person in custody pursuant to the judgment of a State court" has one year to file a federal habeas corpus petition. *See* 28 U.S.C. § 2244(d)(1). That one-year period "runs from the latest of" the following dates:

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1)(A)–(D). But this limitations defense can be waived. *See Paez v. Sec'y, Fla. Dep't of Corr.*, 947 F.3d 649, 655 (11th Cir. 2020) (explaining that the state may "waive the limitations bar").

In our case, the Respondent concedes that "Petitioner's petition . . . is timely under the one-year statute of limitations." Response to Order to Show Cause ("Response") [ECF No. 8] at 7. We'll accept that waiver and treat the Petition as timely. *See Wood v. Milyard*, 566 U.S. 463, 466 (2012) ("A court is not at liberty, we have cautioned, to bypass, override, or excuse a State's deliberate waiver of a limitations defense."); *see also Day v. McDunough*, 547 U.S. 198, 209–10 (2006) ("[A] district court is not required to doublecheck the State's math [for timeliness purposes].").

Beyond meeting this one-year window, though, federal habeas petitioners must also *exhaust* their claims by "*properly* present[ing] [them] to the state courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999). Specifically, federal habeas petitioners must "fairly present every issue raised in [their] federal petition to the state's highest court, either on direct appeal or on collateral review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (cleaned up). "If a petitioner fails to 'properly' present his claim to the state court—by exhausting his claims and complying with the applicable state procedure—prior to bringing his federal habeas claim, then [§ 2254] typically bars [courts] from reviewing the claim." *Id.* In other words, where a petitioner has not "*properly* presented his claims to the state courts," the

petitioner will have "procedurally defaulted his claims" in federal court. *O'Sullivan*, 526 U.S. at 848 (emphasis in original).

All that said, "[s]tates can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 964, 966 (11th Cir. 2016) (cleaned up). But "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005) (same).

### III.   Ineffective Assistance of Counsel

The Sixth Amendment affords a criminal defendant the right to "the Assistance of Counsel for his defen[s]e." U.S. CONST. amend. VI. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To prevail on a claim of ineffective assistance of counsel, a habeas litigant must demonstrate "that (1) his counsel's performance was deficient and 'fell below an objective standard of reasonableness,' and (2) the deficient performance prejudiced his defense." *Raleigh v. Sec'y, Fla. Dep't of Corr.*, 827 F.3d 938, 957 (11th Cir. 2016) (quoting *Strickland*, 466 U.S. at 687–88).

To establish the first prong (deficiency), "a petitioner must [show] that *no* competent counsel would have taken the action that his counsel did take[.]" *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir. 2000) (emphasis added). So, if "some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial[,]" counsel could not have performed deficiently. *Waters v. Thomas*, 46 F.3d 1506, 1512 (11th Cir. 1995) (quoting *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992)).

As for the second prong (prejudice), "a defendant is prejudiced by his counsel's deficient performance if 'there is a reasonable probability that, but for counsel's unprofessional errors, the result

of the proceeding would have been different.'" *Porter v. McCollum*, 558 U.S. 30, 40 (2009) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. To succeed on this prong, however, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

**ANALYSIS**

The Petition asserts thirteen grounds for relief—the twelve Ether advanced in her Postconviction Motion plus a thirteenth she labels "cumulative error." *See generally* Petition. The Respondent *explicitly* pushes an exhaustion defense as to three of these: Ground One, *see* Response at 18 ("Respondent argues that the claim about the delay in filing a motion to preserve evidence was not exhausted."); Ground Three, *id.* at 20 ("The claim made in this petition was not exhausted."); and Ground Thirteen, *id.* at 33 ("Petitioner did not raise this issue as an independent claim in state court. Respondent asserts that it is unexhausted."). While the Respondent doesn't put up an exhaustion defense as to any of the remaining claims, the law requires us to decide whether *each* claim has been exhausted *unless* the state *expressly* waives the exhaustion requirement. *See Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1351 n.33 (11th Cir. 2004) ("[S]tates will not be deemed to have waived the exhaustion requirement unless they indicate their intention to waive the requirement expressly." (citing 28 U.S.C. § 2254(b)(3))). We turn to this question now.

## I.      Exhaustion

To properly exhaust his claim, a habeas petitioner must "fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1284 (11th Cir. 2012) (cleaned up). While a petitioner need not "cite book and verse on the federal constitution," *Duncan v. Henry*, 513 U.S. 364, 365 (1995), he must "alert[] the [state] court to the federal nature of the claim," *Baldwin v. Reese*, 541 U.S. 27, 29 (2004). He

8

accomplishes this only when a "reasonable reader would understand each claim's particular legal basis and specific factual foundation." *Kelley*, 377 F.3d at 1344–45. The Petition asserts thirteen ineffective-assistance-of-counsel claims. Under Florida law, an ineffective-assistance claim can only be raised, for the first time, on state collateral review. *See Sullivan v. Sec'y, Fla. Dep't of Corr.*, 837 F.3d 1195, 1199 (11th Cir. 2016) ("Florida requires that ineffective assistance claims generally be raised on collateral review pursuant to Florida Rule of Criminal Procedure 3.850."). When, as here, a claim is properly presented for the first time on state collateral review, "exhaustion usually requires not only the filing of FLA. R. CRIM. P. 3.850 motion, but [also] *an appeal from its denial*." *Nieves v. Sec'y, Fla. Dep't of Corr.*, 770 F. App'x 520, 521 (11th Cir. 2019) (emphasis added) (quoting *Leonard v. Wainwright*, 601 F.3d 807, 808 (5th Cir. 1979)). But that's still not the end of the line: Once a petitioner has "fairly presented" his federal claim to the state trial and appellate courts, he must then "present that exact same claim to the federal courts—adjacent claims or nominally similar claims do not make the cut." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1158 (11th Cir. 2022) (citing *Picard v. Connor*, 404 U.S. 270, 276 (1971)); *id.* at 1129 ("Comity also requires that the claims the prisoner presents to the district court be the *same claims* the prisoner exhausted in the state courts. To the extent the claims are not the same . . . the federal court will treat the claims as unexhausted.").

Putting aside for a moment the three specific claims the Respondent has said are unexhausted (Grounds One, Three, and Thirteen), we're satisfied that Ether has properly exhausted the other ten. Ether presented each of these ten claims to the state postconviction court in her Postconviction Motion. *Compare* Petition at 5–20 *with* Postconviction Motion [ECF No. 9-1] at 82–112. And each of these claims alleges that trial counsel's deficient performance violated her federal constitutional rights—specifically, her rights to the competent and effective assistance of counsel under the Sixth and Fourteenth Amendments. As a result, the state courts received "a full and fair opportunity to resolve [Ether's] federal constitutional claims," *O'Sullivan*, 526 U.S. at 845—which is probably why the

Respondent didn't raise an exhaustion defense as to these ten claims. Finally, Ether included each of these claims in her appeal of the state court's denial of her Postconviction Motion. *See* Postconviction Initial Brief [ECF No. 9-1] at 161–92. We thus agree that Ether "present[ed] the state courts with the same claim [she] urges upon the federal courts[.]" *McNair*, 416 F.3d at 1302 (quoting *Picard*, 404 U.S. at 275).

Which brings us to the three claims whose exhaustion the Respondent *has* challenged: Grounds One, Three, and Thirteen.

### A.   Ground One

We start with the closest call. The Respondent insists that Ground One *is not* the same claim Ether brought before the state postconviction court. According to the Respondent, Ether now argues in Ground One that "[trial counsel's] delay in time in filing the motion to preserve was deficient"— which (the Respondent claims) was "not the argument that [Ether] made in state court, where she contended that no motion to preserve evidence was filed." Response at 18. We can see why the Respondent says so.

In her original claim, Ether alleged that she told her first trial lawyer, Frank Negron, that the victim's business, Sixth Star, "held files which were favorable to the defendant and would clarify substantial issues with her charge." Postconviction Motion [ECF No. 9-1] at 82. But, Ether said, Mr. Negron ignored her and "did not move to preserve these files and emails as requested by the defendant." *Id.* The original version of this claim, in other words, was rooted in counsel's duty to preserve favorable evidence—a duty counsel allegedly breached by not asking Sixth Star to retain that evidence in its files. In its response to Ether's Postconviction Motion—which the state postconviction court adopted in its order rejecting this claim—the State observed that Mr. Negron "*did* move to preserve the evidence she requested." State's Postconviction Response [ECF No. 9-1] at 124

(emphasis added); *see also* Mot. to Preserve Evidence [ECF No. 9-1] at 203–04; Order Granting Mot. to Preserve Evidence [ECF No. 9-1] at 205.

On appeal, Ether changed her argument *a bit*. She now claimed that "Frank Negron resolved not to preserve the corporate emails and documents necessary to prepare for the speedy trial requested by the appellant. This failure to preserve evidence was a bad faith maneuver to compel the appellant to waive her right to a speedy trial." Postconviction Initial Brief [ECF No. 9-1] at 161–62. In other words, she shifted *ever so slightly* from alleging that Mr. Negron *never* filed a motion to preserve evidence to complaining that Mr. Negron *delayed* the filing of the preservation motion as a part of some sinister ploy to compel Ether to waive her speedy-trial rights. Recall, here, that Ether's speedy-trial concerns made no appearance in the original version Ether pressed before the state postconviction court. And it's this second (*slightly* different) argument—the one she raised for the first time on appeal—that Ether reiterates here in her Petition. *See* Petition at 5 ("[D]efense counsel resolved not to move to preserve evidence held on the accusers' corporate computer servers unless a waiver of speedy trial was granted. Counsel made no move to preserve any evidence for three months after the speedy trial waiver was secured.").

We thus agree with the Respondent that there's some daylight between the argument she advanced in her Postconviction Motion and the Ground she presses here. This daylight has led the Respondent to insist that, while the two claims are *similar*, they're not *identical.* We agree (of course) that, when it comes to federal habeas relief, similar isn't good enough. *See, e.g.*, *Green*, 28 F.4th at 1158 ("[A]djacent claims or nominally similar claims do not make the cut."); *Henderson v. Campbell*, 353 F.3d 880, 898 n.25 (11th Cir. 2003) ("That [the claim] was presented to the state court under the same general legal umbrella but with entirely different factual underpinnings does not constitute fair presentation of the [claim]. Both the legal theory and the facts on which the federal claim rests must be *substantially the same* for it to be the substantial equivalent of the properly exhausted claim."

(emphasis added)). In our view, however, Ether's two arguments—"my lawyer never filed a motion to preserve evidence and, as a result, the evidence was lost" versus "my lawyer delayed the filing of the motion in an effort to force a speedy-trial waiver and, as a result, the evidence was lost"—*are* substantially the same.

To understand why, we need only focus on the harm Ether says she suffered as a result of the deficient performance. In the original version of her claim, Ether alleged:

> Counsel Frank Negron's failure to retrieve and preserve the Sixth Star group of companies' records was highly prejudicial as almost half of the email account was withheld and many server and back up files were not turned over despite repeated motions to compel. Counsel Negron's failure to procure a copy of QuickBooks prevented defense from ever viewing the Sixth Star group of companies accounting files and rebutting testimony with the information contained within that database.
>
> [ . . . . ]
>
> Counsel, Frank Negron, failed to uphold his duty to preserve evidence which was favorable to the defendant. If Counsel Negron had requested a copy of the entire server, the defendant's entire email account, the entire accounting back up drive and procured a copy of QuickBooks software to view [the] accounting files, the jury would have seen emails authorizing transactions from Doug Jones, daily ACH reports which were emailed to Doug Jones with copy [sic] to the defendant, email requests from staff for cash, email requests from staff to make purchases, weekly payroll distribution sheets for cash laborers, emails from Doug Jones requesting change to profit/loss statements to reflect what he was presenting to potential investors, emails from contractors long unpaid and other favorable items contradicting the State's version of the facts and [the jury would have] rendered a different verdict.

Postconviction Motion [ECF No. 9-1] at 83. In this original iteration of the claim, the alleged prejudice is clear: By failing to "retrieve and preserve" certain exculpatory documents, Ether maintained, her lawyer lost the chance to show the jury evidence that would have "contradict[ed] the State's version of the facts." *Id.* Compare this to Ether's claims in her postconviction appeal (restated here as Ground One), where—again—the (alleged) prejudice stems from the spoliation of favorable evidence. *See* Postconviction Initial Brief [ECF No. 9-1] at 161–62 ("*This failure to preserve evidence* was a bad faith maneuver to compel the appellant to waive her right to a speedy trial, accomplished by asserting counsel's inability to prepare an adequate defense *without the evidence needed to prepare.* This bad faith

*failure to preserve evidence* violated the appellant's right to due process and the assistance of counsel[.]" (emphases added)); *see also* Petition at 5 ("Petitioner's rights of due process [and] speedy trial . . . were violated as defense counsel resolved not to move *to preserve evidence held on the accusers' corporate servers* unless a waiver of speedy trial was granted. *Counsel made no move to preserve any evidence* for three months after the speedy trial waiver was secured, six months after her arrest." (emphases added)).

To summarize, then, if Ground One were really—as the Respondent asserts—about counsel's speedy-trial waiver, we'd agree that the claim had not been exhausted. But, although Ether now injects the language of speedy-trial waiver into the claim, Ground One is *still* about counsel's failure to preserve evidence—and that's a problem Ether has highlighted from the beginning. *Compare* Postconviction Motion [ECF No. 9-1] at 83 ("Counsel, Frank Negron, failed to uphold his duty to preserve evidence which was favorable to the defendant."), *with* Petition at 5 ("Counsel made no move to preserve evidence for three months after the speedy trial waiver was secured, six months after her arrest."). The upshot is that, since this is something of a close call, we'll give Ether the benefit of the doubt, consider this claim exhausted, and review it on the merits.[3]

### B. Ground Three

Ground Three likewise has been exhausted. In her Postconviction Motion, Ether claimed that "Judge Barbara McCarthy asked prosecutor Jared Gass about making a plea offer and [Mr. Gass] said they had been thinking, possibly five (5) years. Judge McCarthy asked if the defense would be agreeable to that offer and Counsel Negron immediately refused without consulting the defendant." Postconviction Motion [ECF No. 9-1] at 86. Ether then repeated this same claim on appeal. *See*

---

[3] Any suggestion that Ground One challenges the speedy-trial waiver, by contrast, would be unexhausted—since Ether unambiguously failed to assert a speedy-trial claim when she presented *this* issue to the state courts. *See Pope*, 680 F.3d at 1284 ("A failure to exhaust occurs, in turn, when a petition has not fairly presented every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review.").

Postconviction Initial Brief [ECF No. 9-1] at 163 ("Counsel Negron refused an offer of five (5) years from Judge Barbara McCarthy which was solicited from Assistant State Attorney Jared Gass in open court."). And the Petition reasserts this very same allegation: that counsel was ineffective when "[he] refused a plea offer from Judge Barbara McCarthy in open court with Jared Gass, ASA for five years without consulting the Petitioner." Petition at 8.

As this recitation should make plain, we've reviewed all three versions of this claim and cannot discern any meaningful differences between them. Which is to say that "a reasonable reader" would conclude that Ground Three is a near "carbon copy" of the claim "[Ether] presented to the state courts." *Kelley*, 377 F.3d at 1344. Ground Three, in short, will be reviewed on the merits.

### C.  Ground Thirteen

We also think Ground Three has been exhausted. In both her Postconviction Motion and her Initial Brief, Ether included a "Summation," in which she alleged that "[t]he separate and accumulated errors of the attorneys in this case show a continuous failure to uphold the defendant's [constitutional] rights." Postconviction Motion [ECF No. 9-1] at 112; *see also* Postconviction Initial Brief [ECF No. 9-1] at 194–95 ("[T]he attorneys for the defendant fell outside the wide range of competent assistance in separate and cumulative errors which prejudiced the appellant and denied her a fair trial."). In responding to the Postconviction Motion, the State treated this "summation" as a thirteenth claim of "cumulative error." *See* State's Postconviction Response [ECF No. 9-1] at 142 ("Although not in a numbered [g]round, the defendant's Summation in her 3.850 motion is one of accumulated error.").[4]

---

[4] Under Florida law, the State was not required to file an answer brief after Ether appealed the denial of her Postconviction Motion to the Fourth DCA. *See Williams v. State*, 24 So. 3d 1252, 1252 n.1 (Fla. 1st DCA 2009) ("[T]he State is not required to file a brief in cases involving only summarily denied [postconviction] claims." (citing FLA. R. APP. P. 9.141(b)(2))). Since the State, in fact, filed no such response brief, we cannot know whether it would've treated Ether's "Summation" as a thirteenth claim *on appeal*.

And, in Ground Thirteen of this Petition, Ether—as she did in state court—advances a claim of cumulative ineffective assistance. *See* Petition at 20 ("The separate and continual failures, errors, and misconducts of the attorneys and trial court pervaded the proceedings which separately and collectively violated the Petitioner's constitutional rights."). That's good enough for us. But, even if it weren't, we could still "skip over" this procedural question in cases like ours where the claim can be easily disposed of on the merits. *See Loggins v. Thomas*, 654 F.3d 1204, 1215 (11th Cir. 2011) ("When relief is due to be denied even if claims are not procedurally barred, [the court] can skip over the procedural bar issues."). We'll thus assume that Ground Thirteen, too, has been exhausted.

## II.    The Merits

In reviewing a habeas claim, "we must evaluate the highest state-court decision that evaluated the claim 'on the merits.'" *Marshall v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1277, 1285 (11th Cir. 2016). As we've said, Ether advanced all thirteen of her claims in her appeal of the denial of her Postconviction Motion. *See Ether*, 285 So. 3d at 316. Because the Fourth DCA affirmed without a written opinion, we must "look through the unexplained decision to the last related state-court decision that does provide a relevant rationale." *Wilson*, 138 S. Ct. at 1192. And, since the state postconviction court simply adopted the State's Postconviction Response, *see* Order Denying Postconviction Motion [ECF No. 9-1] at 146 ("[T]he said Motion is hereby DENIED based upon the attached State Response."), we presume that the court simply adopted that response, *see, e.g., Dragic v. Inch*, 2021 WL 836883, at *9 (S.D. Fla. Mar. 5, 2021) (Altman, J.) ("Since the [Fourth DCA] affirmed without a written decision, we 'look through' to the next reasoned decision (i.e., the trial court's Order Denying Post Conviction Relief, which incorporated the State's Response) as the presumptive reasoning of the Fourth DCA.").

One last thing: Because Ether's claims were all "adjudicated on the merits in State court proceedings," we apply the heightened standard of review outlined in § 2254(d). *See* 28 U.S.C. § 2254(d) (prohibiting a federal court from second-guessing a state court's adjudication on the merits

unless it "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"); *see also DeJesus v. Sec'y, Fla. Dep't of Corr.*, 2022 WL 1262093, at *11 (S.D. Fla. Apr. 28, 2022) (Altman, J.) ("Since the substance of [the claim] was adjudicated on the merits in State court proceedings, we must apply the heightened standard of review set out in § 2254(d)." (cleaned up)). As we explain below, we deny each of Ether's remaining claims on the merits.

### A. Ground One

As we've said, in Ground One, Ether alleges that her trial counsel[5] "resolved not to move to preserve evidence held on the accusers' corporate computer servers unless a waiver of speedy trial was granted[,]" and, even after the speedy-trial waiver, "made no move to preserve any evidence for three months." Petition at 5. The Respondent, for its part, maintains that counsel's delay in filing the motion to preserve evidence "was neither deficient nor prejudicial" and adds that, in any event, "[Ether] has failed to show that any evidence was destroyed or deleted." Response at 18. We agree with the Respondent.

Mr. Negron was assigned to represent Ether on September 20, 2012. *See* Amended Notice of Assignment [ECF No. 9-1] at 209. He filed his "Motion to Preserve Evidence"—in which he demanded that Sixth Star preserve whatever evidence it had on its servers—on February 19, 2013. *See* Motion to Preserve Evidence [ECF No. 9-1] at 203–04 ("Accordingly, the Defense seeks to preserve any and all emails utilized by the Defendant. Moreover, the Defendant seeks to preserve any and all

---

[5] Ether was initially represented by Frank Negron, an Assistant Public Defender. But, after representing Ether for some three-and-a-half years, Mr. Negron "resign[ed] from the Public Defender's Office" and was replaced by a new Assistant Public Defender, David Wheeler. Petition at 7. While Ether maintains that both lawyers were ineffective, she directs Grounds One and Two only at Mr. Negron.

servers from the computer system in case those emails were destroyed by the victim/corporation."). To succeed on her central contention—that this six-month "delay" prejudiced her defense—Ether must establish that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. She's failed to meet that burden here.

Ground One, in fact, doesn't tell us what (Ether thinks) was on these servers or how these mystery documents might have resulted in an acquittal. *See generally* Petition; *cf. Fifield v. Sec'y, Dep't of Corr.*, 849 F. App'x 829, 835 (11th Cir. 2021) ("Without allegations about what evidence could have been found with proper investigation, we cannot find that Fifield was prejudiced."); *United States v. Medina*, 918 F.3d 774, 782 (10th Cir. 2019) ("Proving that delay caused an impaired defense requires the defendant to show definite and not speculative prejudice, and in what specific manner missing [evidence] would have aided the defense." (cleaned up)). Indeed, Ether's Petition fails to allege that Sixth Star *actually* destroyed *any* evidence. *See* Response at 19 ("Petitioner has not pointed to a single item that was not obtained. She has failed to show prejudice.").[6] To the contrary, the record is clear

---

[6] In her Reply (it's true) Ether does clarify that "[c]ounsel's failure to obtain a copy of the contents of the entire server prevented defense from reviewing *the work product she created for her accusers* . . . . Furthermore, counsel never acquired a copy of Quickbooks, therefore, [the victim's] accounting files were never reviewed in situ by the defense." Reply [ECF No. 13] at 2 (emphasis added). In that same Reply, she also urges us to review her original Postconviction Motion, which "summarized the documents that] were not obtained for use in her defense." *Id.*; *see also* Postconviction Motion [ECF No. 9-1] at 82 ("Defendant further explained within these files were many items favorable to her defense."). But we don't consider arguments a party makes for the first only in a reply brief. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not fully presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). In any event, while both the Postconviction Motion and the Reply lay out some of the specific documents Ether blames her lawyers for not recovering, she (even there) fails to explain (1) how these documents would have exculpated her or (2) how counsel's delay in filing a motion to preserve evidence prevented counsel from obtaining these documents. *See Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) ("Brownlee's failure to demonstrate that further discovery would have helped the defense clearly bars a finding of prejudice."). In other words, it may be that these documents had already been removed or destroyed before Mr. Negron was assigned the case. Or it may be that none of these documents would have helped Ether anyway. The point is that we don't know the answers to these questions because Ether

that Ether's lawyers fought hard to get information off those servers, *see* Motions to Compel Discovery [ECF No. 9-1] at 215–42 (eight different motions to compel the production of documents from Sixth Star's servers), and that they then used *some* of that evidence at trial, *see, e.g.,* Trial Tr. [ECF No. 10-1] at 773–74 ("[Ether's counsel]: You've heard Mr. Jones testify that he's never asked you for money or to pick up money. [Ether]: Correct. . . . Q: I'm approaching with what's been marked as [Defense Exhibit 2]. What is it? A: It's an email from Doug Jones to [Ether]. Q: What is the date? A: May 3, 2011. Subject, 'Urgent. Negative $108 in my Bank of America account. Q: Is he indicating Sixth Star's bank account or his personal bank account? A: His personal bank account, . . . 'I'm overdrawn, need to get a couple of bones into the account. What is the fastest way to get it into the account? If it's a check, I'll take it and deposit it now. Scrape together whatever we can, just to get me by.'"). And the transcript of Ether's direct examination reveals that counsel introduced many other similar pieces of evidence—*i.e.,* work emails and documents, presumably pulled from Sixth Star's servers, that (Ether claimed) supported her side of the story, which was that Jones was desperate for money. *See also, e.g., id.* at 758–61, 762–67, 768–73.

The truth, then, is that the jury *did* review evidence from these servers—together with Ether's testimony—and still found Ether's account unconvincing. In other words, Ground One simply speculates that Sixth Star *must* have possessed *some other favorable evidence* and that the six-month delay precluded Ether from obtaining it. But, as we've said many times, speculation isn't enough to sustain a viable ineffective-assistance claim.[7] *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) ("[T]he

---

never tells us. And it's not our place, in a habeas proceeding, to speculate about outcomes. *See Dickson v. Wainwright*, 683 F.2d 348, 351 (11th Cir. 1982) ("We emphasize that the burden is on the petitioner in a habeas corpus proceeding to allege sufficient facts . . . . [T]his court will not blindly accept speculative and inconcrete claims[.]" (cleaned up)).

[7] At most, Ether is insisting that she could have produced *more* of the kinds of evidence the jury already reviewed and rejected. But courts rarely sustain ineffective-assistance claims that turn on counsel's failure to pile on cumulative evidence. *See Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011)

acts and omissions about which Tejada complains are within the realm of strategic or tactical decisions, which cannot be the basis of finding counsel ineffective, or are unsupported allegations, conclusory in nature and lacking factual substantiation."). So, we deny Ground One on the merits.

### B.  Ground Two

In Ground Two, Ether claims that trial counsel was ineffective for waiving her right to a speedy trial. In support of this Ground, Ether pushes three arguments: (1) that counsel, in effect, *coerced* Ether into waiving her speedy-trial rights when he "resolved not to move to preserve any evidence" unless Ether waived those rights; (2) that counsel didn't use the extra time to his advantage because he "failed to prepare or conduct any trial" in the three-and-a-half years of his relationship with Ether; and (3) that the delay forced Ether to remain for years in a jail "[that] was not designed for long-term housing." Petition at 7; Reply at 3. We reject each in turn.

Starting with coercion, Florida law is clear that a lawyer can waive his client's speedy-trial rights *without* his client's consent. *See, e.g.*, *Fayson v. Sec'y, Fla. Dep't of Corr.*, 568 F. App'x 771, 773 (11th Cir. 2014) ("An attorney, acting without consent from his client, may waive his client's right to a speedy trial."); *McKenzie v. State*, 29 So. 3d 272, 282 (Fla. 2010) ("[T]he trial court advised McKenzie that although the [speedy-trial] waiver without his consent may have angered him, the conduct, in itself, was not incompetent."). We thus reject the first part of Ground Two—that Mr. Negron waived Ether's speedy-trial rights without her consent (or that he somehow coerced her consent)—because her consent wasn't necessary in the first place.

The second part of Ground Two—that counsel "failed to prepare or conduct any trial" for three-and-a-half years, *see* Petition at 7—fares no better. For *Strickland* purposes, a waiver of speedy trial isn't deficient if "counsel was actively pursuing a defense and preparing for trial, by deposing

_____

("Obviously, a petitioner cannot satisfy the prejudice prong of the *Strickland* test with evidence that is merely cumulative of evidence already presented at trial.").

witnesses, and conducting [an] investigation." *Wells v. McNeil*, 2009 WL 2767659, at \*12 (S.D. Fla. Aug. 25, 2009) (Moreno, J.). Ether *does* say that Negron didn't "prepare an adequate defense" or "prepare for or conduct [a] trial," despite having nearly three-and-a-half years to do so. Petition at 7. But the record belies this allegation. As the State explained in its Postconviction Response—with reasoning that, again, we presume the Fourth DCA adopted—Negron filed "numerous motions to preserve evidence, compel discovery and to obtain subpoena duces tecums[.]" State's Postconviction Response [ECF No. 9-1] at 127. And a quick look at the state-court docket confirms this. *See generally* State Court Docket [ECF No. 9-1] at 3–5 (showing multiple defense motions to compel discovery, notices of taking depositions, and frequent hearings in the years leading up to trial). As the Respondent points out here, Ether's case was extremely complex and "involved transactions occurring on multiple bank accounts over an extended period of time, as well as internal correspondence and explanations of expenses." Response at 19; *see also* Notice of Intent to Reply Upon Summaries of Voluminous Writings [ECF No. 9-1] at 248–85 (notifying Ether of the State's intent to introduce a summary of all her fraudulent transactions).

Simply put, the state court reasonably applied *Strickland* when it denied this claim because the record shows that defense counsel used the extra time to review and contest the State's voluminous evidence. Indeed, the state-court docket reveals that, in the four years between Ether's arrest and her trial, defense counsel filed *at least* 21 motions (mainly to compel discovery or for bond) and took several depositions of material witnesses. *See* State Court Docket [ECF No. 9-1] at 2–5. We cannot fault counsel for taking the time to do the hard pretrial work of collecting discovery and deposing the State's witnesses—especially in a complex fraud case like this one. *See Bannister v. Inch*, 2021 WL 2567512, at \*5 (S.D. Fla. June 23, 2021) (Altman, J.) ("Counsel cannot be blamed for doing what any reasonable lawyer would have done: taking his time to review all the evidence, explore all settlement options, and depose all the State's witnesses"); *Jackson v. Sec'y, Fla. Dep't of Corr.*, 2021 WL 3371294, at

*7 (M.D. Fla. Aug. 3, 2021) ("Of course, here, the state court found good cause for counsel to seek continuances as counsel needed the time to investigate and prepare the case.").

The third part of Ground Two likewise fails because Ether doesn't explain how her lengthy pre-trial detention prejudiced her right to a fair trial. Prejudice, remember, "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687. Instead of alleging prejudice, Ether complains that, because of the waiver, she was "continually incarcerated [for] four-and-a-half years, in a facility not designed for long term housing, waiting for trial to commence." Petition at 7; *see also* Reply at 3 ("Counsel's exit from the Public Defender's Office left the Petitioner waiting in county jail for another eight months."). But, to prevail on her *Strickland* claim, Ether must show that trial counsel's "errors" had some effect on her judgment. *See Strickland*, 466 U.S. at 691 ("An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect *on the judgment*." (emphasis added)). That's because § 2254 asks only whether "a person in custody pursuant to the judgment of a State court . . . *is in custody* in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a) (emphasis added). So, Ether's claim that counsel's ineffectiveness led to a pretrial detention that was both needlessly long and unpleasant isn't cognizable under § 2254. *See, e.g.*, *Medberry v. Crosby*, 351 F.3d 1049, 1060 (11th Cir. 2003) ("State pre-trial detention, for example, might violate the Constitution or laws or treaties of the United States. Yet a person held in such pre-trial detention would not be 'in custody pursuant to the judgment of a State court.'" (citing 28 U.S.C. § 2254(a))). We thus deny Ground Two.

## C.  Ground Three

Ether alleges in Ground Three that "[d]efense counsel refused a plea offer from Judge Barbara McCarthy in open court with Jared Gass, ASA for five years without consulting the Petitioner."

Petition at 8. The Respondent counters that "the record refutes Petitioner's claim that an actual offer of five years was extended and rejected by defense counsel." Response at 20–21.

It's true that counsel's failure to communicate a formal plea offer to a defendant constitutes deficient performance under *Strickland*. *See Missouri v. Frye*, 566 U.S. 134, 147 (2012) ("Here defense counsel did not communicate the formal offers to the defendant. As a result of that deficient performance, the offers lapsed."). But Ether has failed to point us to the specific hearing during which this five-year offer was allegedly made. *See generally* Petition; Reply. And that's precisely what she did in state court, where she claimed—without offering any date or citation—that "Counsel Negron refused an offer of five (5) years from Judge Barbara McCarthy which was solicited from Assistant State Attorney Jared Gass in open court. (Transcript unavailable)." Postconviction Initial Brief [ECF No. 9-1] at 163); *see also* State's Postconviction Response [ECF No. 9-1] at 128 ("The defendant does not state when this offer was allegedly made, therefore the State is unable to order the transcript."). This evidentiary lacuna is reason enough to reject her claim. *See Tejada*, 941 F.2d at 1559 ("A petitioner is not entitled to an evidentiary hearing, however, when his claims are merely conclusory allegations unsupported by specifics[.]" (cleaned up)). Ether, after all, bears the burden of proving her claims with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 342 (2003) ("[T]o the extent that the merits of the case will turn on the agreement or disagreement with a state-court factual finding, the clear and convincing evidence and objective unreasonableness standards will apply."); *Jones v. Walker*, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc) ("Federal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence."). When she says that something happened in open court, in other words, it's on her to show us when and where the thing occurred—at the very least so that the Respondent can pull a transcript of the hearing and either confirm or deny the allegation. On habeas review, we're limited to the record before us, *see Cullen v. Pinholster*, 563 U.S. 170,

181 (2011) ("We now hold that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."), and it's not our job to look beyond that record for evidence Ether (for her own reasons) chose not to cite or append, *see Chavez v. Sec'y Fla. Dep't of Corr.*, 647 F.3d 1057, 1061 (11th Cir. 2011) ("[D]istrict court judges are not required to ferret out delectable facts buried in a massive record[.]").

In any case, there's some evidence that no such offer was ever made. So, for instance, on the morning of jury selection, the prosecutor (Assistant State Attorney Emma Lubin) and the judge engaged in the following colloquy:

> [The Court:] Has the State made any plea offers to the defendant in this case?
>
> Ms. Lubin: I don't believe so. I know it's kind of not an answer, but it's—I've been on the case only for a few months, and from what I understand is that no formal offer has been made. There's been discussion about an offer between 15 to 20 years followed by probation with restitution, but I don't know if that was formally offered. And anything below that, I don't believe was ever offered, any lower offer than 15 years in prison. So from what I understand, no formal offer has been made. I have not made a formal offer.
>
> The Court: And nothing in your file would indicate that Mr. Silver or anybody else made an offer?
>
> Ms. Lubin: I believe there have been discussions with the victim, . . . but I don't see any e-mails to Mr. Negron or Mr. Wheeler saying, "here is the State's offer to resolve." So if there was one, I am not aware of it.

Trial Tr. [ECF No. 10-1] at 15–16. The judge then asked defense counsel (David Wheeler) whether *he* had received any offers from the State, and his answer—given in Ether's presence, *id.* at 4 ("The Court: And, of course, Ms. Ether is present.")—undermines Ether's contention that five years was on the table. As Wheeler explained: "[T]he last offer I received from Ms. Lubin, I guess, is a tacit offer, was 17 years in the Florida State Prison. Mr. Negron [prior counsel] didn't leave indication as to what the actual offer was." *Id.* at 16.

In its Postconviction Response, the State presented this exchange as dispositive on the question of whether any such five-year offer was made. *See* State's Postconviction Response [ECF No.

9-1] at 128 ("[T]here was no offer made by the State, only the possibility of an offer."). And our state courts *have* observed that a lawyer cannot be faulted for failing to communicate an offer that was never made. *See Forbes v. State*, 269 So. 3d 677, 681 (Fla. 2d DCA 2019) ("Consequently, it goes without saying, counsel cannot be deficient for failing to communicate a nonexistent offer."). The Eleventh Circuit, for its part, has found a similar on-the-record exchange highly probative on the all-important issue of whether a plea offer was extended in the first instance. *See Turbi v. Sec'y, Dep't of Corr.*, 800 F. App'x 773, 775 (11th Cir. 2020) ("[A]t sentencing, the prosecutor stated that a plea offer was never made, and, notably, defense counsel did not object to this statement. Because the record indicates, at most that the state had contemplated giving a plea offer to Turbi, but never formally extended it to him, the state court's determination that the prosecuting attorney did not extend a plea deal [to Turbi] was a reasonable one.").

Admittedly, though, our case is a bit different because, in a separate part of the trial transcript, Ether *did allege* that she had been present when the original five-year offer was made:

> Mr. Wheeler: Judge, just to be clear, my client did inform me Judge McCarthy demanded that the State make an offer on the record in open court, and that offer was five years in Florida State prison.

> The Court: Unfortunately, new judges kind of mess it up for us old judges that know the law. . . . Judge McCarthy was acting outside the scope of her authority as a circuit judge to make a demand that the State make an offer. She can't do that, no judge can.

Trial Tr. [ECF No. 10-1] at 17.

Still, we deny this claim for a simple reason: Ether fails to allege prejudice. "[A] defendant must show that but for the ineffective assistance of counsel there is a reasonable probability that . . . the defendant would have accepted the plea." *Lafler v. Cooper*, 566 U.S. 156, 164 (2012); *see also Alcorn v. State*, 121 So. 3d 419, 430 (Fla. 2013) ("[T]o establish prejudice, the defendant must allege and prove a reasonable probability . . . [that] he or she would have accepted the offer had counsel advised the defendant correctly."). But Ether never claims that, had she known about the five-year offer, she

would have accepted it. *See* Petition at 8 ("Defense counsel refused a plea offer . . . without consulting the Petitioner or obtaining her consent to accept or reject this offer."). Nor could she. Ether, recall, admits that she was present in court when the offer was extended. *See* Postconviction Motion [ECF No. 9-1] at 86 ("Frank Negron immediately rejected the offer on behalf of the defendant without first consulting her for permission to do so. The defendant was not permitted to query the court."). She thus would have been well aware of the offer and would have been in a position to accept it if she'd wanted to. That she did not accept it supports one of two ineluctable inferences: either that no offer was ever made (in which case Mr. Negron cannot be faulted for having rejected it) or that, having heard the offer in open court, Ether elected not to accept it (in which case Ether would have suffered no prejudice). Either way, Ground Three fails.

### D. Ground Four

In Ground Four, Ether alleges that counsel was ineffective when he "failed to appeal to the higher court" after the trial court "[denied] pre-trial release on non-monetary conditions without cause." Petition at 10. The Respondent parries that "[t]his issue is not cognizable in a federal habeas," Response at 22, and we agree. As we've explained, federal habeas petitioners cannot challenge, under the auspices of § 2254, the terms and conditions of their pre-trial detention. *See Medberry*, 351 F.3d at 1060 ("State pre-trial detention, for example, might violate the Constitution or laws or treaties of the United States. Yet a person held in such pre-trial detention would not be 'in custody pursuant to the judgment of a State court.'"); *see also Murphy v. Hunt*, 455 U.S. 478, 481 (1982) ("Hunt's constitutional claim to pretrial bail became moot following his convictions in state court."); *Bilal v. Hadi*, 2006 WL 3201324, at *2 (N.D. Fla. Nov. 2, 2006) (denying a § 2254 petition challenging excessive bail because "[c]ourts have held that a claim concerning pretrial bail becomes moot upon a defendant's plea or conviction."). Nor can Ether circumvent this bright-line rule by couching her pre-trial-detention claim in the language of ineffective assistance. *See Chambers v. Cash*, 2014 WL 6610809, at *6–*7 (E.D. Cal.

Nov. 19, 2014) (Claire, Mag. J.) (recommending the denial of a claim that "counsel performed unreasonably in seeking to reduce the bail amount" since "a challenge to bail is not cognizable when brought by a sentenced prisoner"), *report and recommendation adopted*, No. 12-CV-02855 (E.D. Cal. Jan. 15, 2015), ECF No. 22. We thus deny Ground Four.

### E.  Ground Five

In Ground Five, Ether blames her lawyer for "fail[ing] to obtain clarification of the Information discrepancies [sic] of the legal identities of the accusers." Petition at 16. In essence, Ether is saying that the Information—the written charge the State brought against her—failed to identify the victim, and that its lack of specificity in this regard exposed her "to the danger of a new prosecution for the same offense." *Id.*; *see also* Reply at 5. The Respondent unsurprisingly disagrees. In its view, the Information was specific enough, and "[t]here was no confusion" about the identity of the victims. Response at 23–24.

"The sufficiency of a state indictment is an issue on federal habeas corpus only if the indictment was so deficient that the convicting court was deprived of jurisdiction." *Heath v. Jones*, 863 F.2d 815, 821 (11th Cir. 1989). A charging document is not deficient when it "sets forth the elements of the offense in a sufficiently clear language capable of providing notice of the charges." *Wilson v. Dep't of Corr.*, 2018 WL 9617537, at *15 (S.D. Fla. June 20, 2018) (White, Mag. J.), *report and recommendations adopted*, 2018 WL 9617372 (S.D. Fla. Aug. 15, 2018) (Moreno, J.), *aff'd*, 786 F. App'x 878 (11th Cir. 2019). The State's Information specifically identified the victim as "John Douglas Jones d/b/a Doug Jones and Company, Sixth Star Marketing and Entertainment, and/or Sixth Star Entertainment, and/or Sixth Star, Inc." Information [ECF No. 9-1] at 8. As the state court rightly concluded by adopting the State's Response, the victim of the alleged theft was John Douglas Jones and his business, so "[t]here was no doubt as to the identity of the victim." State's Postconviction Response [ECF No. 9-1] at 133; *see also id.* ("The record conclusively refutes [Ether's argument that]

the identity of the victim required clarification, [that] the defendant was unjustly tried, and [that] if the names of the companies had been clarified the verdict would have differed.").

This conclusion was bolstered by Mr. Jones's testimony at trial. Mr. Jones testified that he started his business on January 4, 2002, as "Doug Jones and Company with a d/b/a of Sixth Star Entertainment and Marketing." Trial Tr. [ECF No. 10-1] at 356–57. According to Mr. Jones, Sixth Star "has always been entertainment based. And during the course of the 15 years we've done many types of entertainment productions." *Id.* at 357–58. In 2011, Mr. Jones split Sixth Star into two separate business: Sixth Star, Inc., and Sixth Star Entertainment. *Id.* at 359. Sixth Star, Inc., handled "the cruise side" of the business, while Sixth Star Entertainment "is the umbrella that we run the event side." *Id.* Mr. Jones also explained that Ether had worked for him as a bookkeeper since "June of 2005," and that—as a result—she would have been very familiar with Sixth Star's structure. *Id.* at 359–60. Mr. Jones's testimony makes clear that, although his business has had several names through the years, Sixth Star has remained the same company under his control since 2002.

In short, any motion to clarify the identity of the victims would have been denied. And, since counsel cannot be faulted for failing to raise frivolous objections, Ground Five is likewise denied. *See United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) ("[C]ounsel is not ineffective for failing to raise claims reasonably considered to be without merit." (cleaned up)); *German v. Inch*, 2020 WL 5087046, at *21 (S.D. Fla. Aug. 28, 2020) (Altman, J.) ("As with so many of German's claims, however, his counsel cannot be faulted for failing to advance meritless objections.").

## F. Ground Six

In Ground Six, Ether blames her lawyer for failing to "preserve/present exculpatory evidence including transaction authorizations, requests for cash and/or purchases, receipts for purchases and other documents stored on two flash drives." Petition at 16. Ether claims that these two flash drives went "missing the day trial commenced," and that, by the time they were found, "the bulk of its

content had been deleted." *Id.* According to the Respondent, Ground Six is "merely conclusory and unsupported by specifics." Response at 24. Plus, the Respondent adds, Ether "does not explain how the failure to have [this evidence] prejudiced her." *Id.*

In denying this claim, the state court adopted the State's Postconviction Response, which had argued that Ether could show no prejudice because "this [g]round is based upon speculation [sic] the evidence the defendant claims were on the flash drives would have resulted in a different verdict." State's Postconviction Response [ECF No. 9-1] at 134. This was a reasonable application of *Strickland*. Ether (it's true) claims that the evidence on the flash drives would have been "exculpatory." Petition at 16; *see also* Reply at 5 ("[T]he numerous documents stored on those drives [were] critical to [Ether's] defense."). And she does list some of the documents that (she says) were on the drives. *See* Petition at 16 (stating that "transaction authorizations, requests for cash and/or purchases, receipts for purchases, and other documents" were stored on the flash drives).  But she never explains *how* these documents— if introduced at trial—would have created a "reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. It's not enough, in other words, to cite some documents and then, in the most conclusory terms, speculate (as Ether does) that they would have saved the day. *See Hill v. Sec'y, Fla. Dep't of Corr.*, 578 F. App'x 805, 809 (11th Cir. 2014) ("Hill argues that her counsel was deficient for failing to investigate or obtain her and her husband's phone records . . . . Because Hill has not shown what the phone records would have demonstrated, she has not proved a reasonable probability that presenting phone records would have changed the outcome of the proceeding."); *see also Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001) ("Johnson offers only speculation that the missing witnesses would have been helpful. This kind of speculation is insufficient to carry the burden of a habeas corpus petitioner." (cleaned up)); *Maddox v. Tucker*, 2012 WL 13176114, at *8 (S.D. Fla. Feb. 14, 2012) (White, Mag. J.) ("Speculative and conclusory claims are inadequate as a matter of law to raise a claim of ineffective assistance of counsel

that merits relief. The petitioner must provide evidence, not just conclusory allegations that counsel failed to discover information that is exculpatory." (cleaned up)), *report and recommendation adopted*, 2012 WL 13176115 (S.D. Fla. Apr. 24, 2012) (Graham, J.). Ground Six, in short, is denied.

### G.  Ground Seven

In Ground Seven, Ether castigates her lawyer for "fail[ing] to object to the State's use of a large neon yellow demonstrative aid with bold black print whose appearance alone shifted the burden of proof directly to the defense." Petition at 17. In Ether's opinion, this demonstrative aid invited the jury to "forgo reviewing the actual evidence." *Id.* Ether also claims that the demonstrative was "admitted" without "instructions to the jury as to how it should be considered." *Id.* at 17; *see also* Reply at 5 ("[I]t was not explained to the jury from the beginning that the aid was not evidence, that court exhibits are different and should not be viewed as evidence."). The Respondent counters that the aid "was not admitted as evidence," and that, in any event, it provided an accurate summary of the Ether's transactions, Response at 25—a point Ether never challenges, *see generally* Petition (failing to allege that the information in the demonstrative was inaccurate or misleading); Reply (same). The record includes no image of the demonstrative aid, but the state court adopted the State's Postconviction Response, which had contended: "The use of this board did not shift the burden of proof to the defendant. It was a permissible summary of the victim's testimony of all the checks the defendant had written to herself without the victim's permission." State's Postconviction Response [ECF No. 9-1] at 136.

Florida law allows demonstrative aids when "they are relevant to the issues in the case and constitute an accurate and reasonable reproduction of the object involved." *Love v. State*, 259 So. 3d 23, 39 (Fla. 2018) (cleaned up). At the same time, demonstrative aids should not be admitted into evidence and may not go back to the jury during deliberations. *See Gold, Vann & White, P.A. v. DeBerry*, 639 So. 2d 47, 57 (Fla. 4th DCA 1994) ("[W]e believe the better practice is to mark [demonstrative

aids] as 'Court Exhibit __, Not in Evidence.' They can be made part of the record, for appellate review, but should not be in evidence nor given to the jury for their deliberations.").

In our case, the trial court followed Florida law. The judge didn't admit the demonstrative aid into evidence and labeled it, instead, as a "Court Exhibit." Trial Tr. [ECF No. 10-1] at 385 ("I'll make it a court exhibit."). Contra Ether's view, in fact, *both* the prosecutor and the judge instructed the jury that the aid was *not* evidence and that it should not be considered in the same way as other exhibits. *See id.* at 955 ("The Court: By the way, this chart is not in evidence, this is just a demonstrative aid, you won't get it back in the jury room."); *id.* at 979 ("[The State:] [T]hat demonstrative board, that doesn't go back because it was never introduced into evidence. It was just for demonstrative purposes, to give you a visual."). The state court adopted the State's Postconviction Response, which had argued that counsel wasn't ineffective for failing to object to this demonstrative. *See* State's Postconviction Response [ECF No. 9-1] at 136 ("Defense counsel cannot be deemed ineffective for failing to make a frivolous or baseless motion."). Nothing in the record suggests that this conclusion was erroneous or unreasonable. To the contrary, as we've said, a lawyer cannot be faulted for failing to advance an unviable objection. *See Nyhuis*, 211 F.3d at 1344 ("[C]ounsel is not ineffective for failing to raise claims reasonably considered to be without merit." (cleaned up)).

Still resisting, Ether insists that counsel should've objected because the demonstrative was so compelling that it caused "the jury to forgo reviewing the actual evidence." Petition at 17. Two problems with this. *One*, since the demonstrative did nothing more than summarize Ether's own misconduct—a point Ether never challenges—it was proper under Florida law. All compelling government evidence is, of course, prejudicial to the defense—that's the point. But that doesn't make it improper. *Two*, in suggesting that the demonstrative impelled the jury to ignore all the evidence, Ether is simply speculating. And that's precisely why the Middle District of Florida recently denied a habeas petition that advanced (essentially) this same claim. *See Turbi v. Secy., Dep't of Corr.*, 2018 WL

3772090 (M.D. Fla. Aug. 9, 2018). In *Turbi*, a federal habeas petitioner blamed his lawyer for failing to object when the jury "was provided a map that had been used as a demonstrative aid but had not been introduced into evidence." *Id.* at *8. As Ether does here, Turbi characterized the map as so powerfully incriminating that, "after the jury received it, they determined Turbi was guilty as charged." *Id.* The court rightly rejected this argument, calling it "conclusory and speculative," *id.*, and we agree. We therefore deny Ground Seven.

### H. Ground Eight

In Ground Eight, Ether says that counsel "failed to properly object to the admittance of the summaries of stolen items, objecting to the reliability of the documents when he held in hand numerous inaccuracies contained in the summaries." Petition at 17. But, according to the Respondent, "[t]he record shows that counsel *did* object to the admission of the summary." Response at 26; *see also* State's Postconviction Response [ECF No. 9-1] at 137 ("Defense counsel did object to the admissibility of the summary."). In her Reply, Ether concedes that her lawyer objected to the summary but (without explanation) reiterates her view that counsel failed to "properly object." Reply at 6. The state court rejected this claim—and so do we.

The trial transcript plainly shows that counsel did "properly object" to this summary. He, after all, argued—at some length—that the summary was neither accurate nor reliable. *See* Trial Tr. [ECF No. 10-1] at 578 ("Judge, I have an objection as to the reliability of this document.").[8] Ground Eight, in short, is denied.

---

[8] At one point, Ether suggests that the summary included some "legitimate payroll," but she doesn't explain what she means by this. *See* Petition at 17; Reply at 6. She also doesn't tell us what was wrong with the admission of these payroll records or what her lawyer might have done to exclude them. We don't know what else to say about this. *Cf. Dickson*, 683 F.2d at 351 ("[T]his court will not blindly accept speculative and inconcrete claims[.]").

### I. Ground Nine

In Ground Nine, Ether faults her lawyer for failing to "impeach state witnesses with inconsistent and/or contradicted testimony." Petition at 18. In her Petition, she doesn't specify which witnesses she's talking about—and she certainly never deigns to tell us how these witnesses might have been impeached. Which is all reason enough to deny this claim of the bat. *See Chavez*, 647 F.3d at 1061 ("With a typically heavy caseload and always limited resources, a district court cannot be expected to do a petitioner's work for him. . . . '[J]udges are not like pigs, hunting for truffles buried in briefs.'" (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))); *Campbell*, 26 F.4th at 873 ("[F]ailure to raise an issue in an initial brief . . . should be treated as a forfeiture of the issue, and therefore the issue may be raised by the court *sua sponte* [only] in extraordinary circumstances.").

Still, we'll give Ether the benefit of the doubt and assume she's talking about the same witnesses she complained about in her Postconviction Motion: Shawna Deyo and Doug Jones. *See* Postconviction Motion [ECF No. 9-1] at 95–96. The Respondent urges us to reject this claim for being "conclusory and vague and . . . insufficient to state a claim warranting relief." Response at 28.

To show that counsel was ineffective for failing to impeach a witness, Ether must establish *both* that the failure to impeach was unreasonable *and* that it could have affected the outcome of the trial. *See Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) ("Absent a showing of a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial, the petitioner is unable to show prejudice necessary to satisfy the second prong of *Strickland*." (cleaned up)); *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1354 (11th Cir. 2019) ("Meders has failed to show that had trial counsel used all of the impeachment material during the guilt phase of his trial, every fairminded jurist would concluded that there is a substantial, not just conceivable, likelihood that the result of his trial would have been different." (cleaned up)).

Again, we presume that the state court adopted the State's Postconviction Response, which had contended, on this issue, that "[t]here was no reasonable probability the outcome of the trial would have been different." State's Postconviction Response [ECF No. 9-1] at 137–38.

Ether's position is that, by impeaching Jones and Deyo with their prior inconsistent statements, counsel could have done irreparable damage to their credibility. *See* Postconviction Motion [ECF No. 9-1] at 100 ("[Counsel's] failure to impeach State witnesses with inconsistent testimony led the jury to believe the testimony was credible and [that] the witnesses were to be believed."). Here's a list of the damaging inconsistencies Ether identified in her original Postconviction Motion:[9]

- Deyo lied when she said the summary she prepared "included PayPal and credit card transactions." *Id.* at 96.
- Deyo initially (and incorrectly) claimed that "the fraudulent items listed in the summary did not have the defendant listed in the QuickBooks [e]ntry," but then corrected herself by saying that some of the entries did show Ether's name. *Id.*
- Deyo misled the jury by claiming that "she was laid off for all of 2011," even though she "was still receiving Sixth Star health insurance as of July 2011." *Id.*
- Jones incorrectly claimed that only Ether "had access to and routinely used QuickBooks and cut checks." *Id.* at 97.
- Jones falsely testified that no QuickBooks entries were in Ether's name. *Id.*
- Jones inconsistently claimed that Sixth Star was "all self invested," but also said that he used "money received from his mother" to start the business. *Id.* at 98.
- Jones claimed that "no one used their own money to make [a] company purchase," even though there was evidence that Sixth Star employees "were [ ] due reimbursements." *Id.*

---

[9] This list doesn't include inconsistent statements Jones purportedly made "[i]n a letter to Judge Barbara McCarthy on July 10, 2014." Postconviction Motion [ECF No. 9-1] at 96. But this "letter" was actually a "victim impact statement" Ether's probation officer included in a "Pre-Plea Pre-Sentence Investigation Report." *See* Pre-Sentence Investigation Report [ECF No. 9-1] at 287–98. As the Respondent points out, this letter "was not introduced at trial." Response at 29. In fact, Florida law is clear that the contents of a pre-sentence investigation report (which would include this victim impact statement) are—outside of sentencing—totally confidential. *See* FLA. R. CRIM. P. 3.172 ("The presentencing investigation shall not be a public record[.]); FLA. R. CRIM. P. 3.173(a) ("The trial judge may disclose any of the contents of the presentence investigation to the parties *prior to sentencing*." (emphasis added)). Counsel (it goes without saying) cannot be blamed for failing to cross-examine Jones about statements that couldn't be introduced at trial in any event. *See Nyhuis*, 211 F.3d at 1344 ("[C]ounsel is not ineffective for failing to raise claims 'reasonably considered to be without merit.'"); *cf. Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

- Jones incorrectly said that "the bank only verified one check ever." *Id.* at 98–99.
- Jones was "inconsisten[t] regarding the defendant's pay." *Id.* at 99.
- Jones claimed that "he considered [Ether] a friend, [and] he confided in her," even though he admitted that he wouldn't allow her to cut checks without supervision. *Id.*
- Jones falsely claimed that "refunds were given quarterly," even though there was evidence that "people were waiting months" for refunds. *Id.*

To begin with, the decision to impeach (or not impeach) a particular witness with a specific piece of evidence is precisely the kind of strategic choice we rarely second-guess on collateral review. *See, e.g.*, *Fugate*, 261 F.3d at 1219 ("The decision as to whether to cross-examine a witness is a tactical one well within the discretion of a defense attorney." (cleaned up)); *United States v. Johnson*, 603 F. App'x 867, 873–74 (11th Cir. 2015) ("Similarly, Kelvin's counsel was not ineffective in failing to impeach Rogers. . . . This Court will not second guess the reasonable strategic decisions of counsel, and counsel's performance in this regard was not deficient."). Who are we, after all—years after the fact—to Monday-morning quarterback counsel's decisions about which questions to ask and when? We weren't there—he was. We didn't spend years preparing this case for trial—he did. We didn't spend hours questioning and then selecting the members of this jury—he did that. And we don't think it's too much to suggest that counsel knows his case—and his jurors—far better than we do.

In any event, from our perspective, there's very little chance that counsel could have tilted the scales with any of these statements. Take, for example, Deyo's (alleged) misstatements. The first seems somewhat irrelevant because the prosecution's case turned, not on PayPal and credit-card transactions, but on bank transfers. Either way, this inconsistency would have been (at best) rather cumulative given the tactic counsel repeatedly (and to some effect) employed with Deyo—*i.e.*, showing that her summaries were mostly harmless and untrustworthy because she wasn't a trained bookkeeper. *See* Trial Tr. [ECF No. 10-1] at 611 ("Q: Ms. Deyo, you don't work in accounting, right? A: No, I do not. Q: You don't work in bookkeeping? A: No. Q: You don't have any training in accounting or QuickBooks? A: No."). Remember that "a petitioner cannot satisfy the prejudice prong of the *Strickland* test with

evidence that is merely cumulative of evidence already presented at trial." *Rose v. McNeil*, 634 F.3d 1224, 1243 (11th Cir. 2011).

There was nothing to cross-examine about the second misstatement because Deyo corrected it herself. *See* Postconviction Motion [ECF No. 9-1] at 96 (admitting that Deyo corrected herself by saying that some of the entries *did* show Ether's name). And the third (alleged) misstatement is really much ado about nothing. Maybe Deyo *was* receiving healthcare benefits for some time after she was fired—not an implausible scenario—or maybe she forgot the precise date of her termination. Either way, this seemingly-innocuous aspect of Deyo's presentation—largely orthogonal, in any event, to the main thrust of her testimony—was unlikely to make the least bit of difference to the case.

As for the Jones inconsistencies, the trial transcript reveals that counsel *did* press many of these points—including Sixth Star's financial troubles and its inability (or unwillingness) to pay refunds and reimbursements. *See, e.g.*, Trial Tr. [ECF No. 10-1] at 446 ("Q: So what happened with this tax lien that you had against your company? A: Well, basically the—I took it on myself."); *id.* at 453 ("Q: Did you have the money to give them a refund? A: It's always a matter of cash; sometimes yes; sometimes no."). As for the rest, they're mostly (very) minor points that counsel cannot be faulted for not pursuing. So, for instance, when Jones said that Sixth Star was all "self invested," can we really call him a liar by showing that some of that self-investment came from his mom? Is there actually an inconsistency between liking Ether and requiring her work to be supervised? As a wise man once said: "Trust, but verify." *See Stampley v. Altom Transp., Inc.*, 958 F.3d 580, 582 (7th Cir. 2020) ("This case demonstrates the wisdom of the old Russian proverb popularized by President Reagan: 'Trust, but verify.'"). And do we really think the jury cared whether the QuickBooks entries were in Ether's name, how many checks the bank verified (likely hearsay in any case), and whether Ether was inconsistently paid? Of course not. The question in the case was whether Ether stole Sixth Star's money. And the State's evidence—as we've seen—showed overwhelmingly that she had. *See* Trial Tr. [ECF No. 10-1]

at 593 ("Q: When you reviewed everything from Sixth Star to make this summary, did you determine the different ways in which the defendant stole money from Sixth Star? A: Yes, I did. Q: What was one way? A: [Ether] would write a check in her name and either, you know, deposit it—I would see checks made out to her name with her signature on the back and her bank account number underneath. . . . Q: And when you saw those checks that were made out to [Ether] . . . what would the QuickBooks entry be generally? A: Names of different vendors that we've used through the years."); *id.* at 790 ("Q: [E]very single one of those [checks] were deposited into your personal bank account, correct? [Ether:] Correct. Q: And you agree that every single one of those checks has a QuickBooks entry that doesn't line up with your name, correct? A: Correct."). And Ether's claim that she was stealing this money from Jones at Jones's direction and to further *his* interest was revealed to be preposterous in light of her personal spending decisions. *See, e.g.*, *id.* at 797–98 ("Q: Okay. So What you're telling the jury is that on 2/16, when you then went to the casino with that money, you withdrew money for Doug Jones? A: Possibly. Q: So how are we supposed to know if this is for your personal needs or for his? . . . A: We don't."). These minor inconsistencies, in short, couldn't have made the least bit of difference because they neither meaningfully impugned Jones's credibility nor contradicted the State's evidence—which conclusively showed that Ether stole the company's money for her own personal gain. *See Pinkney v. Sec'y, DOC*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

One last thing on this impeachment claim. Most seasoned trial lawyers learn an important lesson about cross-examination very early on in their careers: just because you *can* impeach someone doesn't mean you *should*. *See Dorsey v. Chapman*, 262 F.3d 1181, 1185–86 (11th Cir. 2001) ("[T]rial counsel's decision to not impeach the alternate personalities with prior statements was based on a strategic refusal to participate in the trial court's decision to allow the dissociative testimony. This trial

tactic was intended to impress upon the jury the untrustworthiness of the dissociate testimony[.]”); *Hunt v. Comm'r, Ala. Dep't of Corr.*, 666 F.3d 708, 724 (11th Cir. 2012) (“There is a strong presumption that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than sheer neglect.” (cleaned up)). In the end, counsel repeatedly—and to no small effect—attacked the credibility of these two witnesses. He laid the groundwork for this attack in cross examination. *See, e.g.*, Trial Tr. [ECF No. 10-1] at 456–57 (“Q: Well, the reason I ask is you said Alicia never had permission to stamp the checks. [Doug Jones:] Never had permission to stamp the checks. Q: But there were times in which she would have permission to stamp the checks? A: She would have had to have permission, direct permission.”); *id.* at 607 (“Q: And you directly blame Alicia Ether for you being laid off; is that correct? [Shawna Deyo:] Yes, I do.”). And he followed through on his assault by casting doubts about these witnesses' motivations in closing argument. *See, e.g., id.* at 923 (“Let's talk about their number one witness, John Douglas Jones, present today. Obviously has an interest in this case. He's a trained actor.”); *id.* at 929 (“[Shawna Deyo] directly blames Alicia Ether for her being laid off.”); *id.* at 936 (“And Doug Jones is going to sit there on the stand and tell you, I was in the dark, I didn't have a clue what was going on with my finances . . . . Every check that was stamped and cashed was approved by him.”); *id.* at 938 (“Doug Jones had his eye on the books the entire time. He heard every week what shape those books were in, and he had his hand in the pot that entire time.”). Since we're “not convinced that every reasonable jurist's confidence in the outcome of the trial would have been undermined” by piling a bit more sand onto this mountain of impeachment material, *Meders*, 911 F.3d at 1354, we deny Ground Nine.

### J.   Ground Ten

In Ground Ten, Ether claims that, in closing, her lawyer “pled the Defendant guilty the jury without her consent.” Petition at 18 (errors in original). Here's the part of the closing argument she's talking about:

> Did Alicia Ether take the money? She did. She sure did. But did she live high on the hog? Did she drive any fancy cars? Did she vacation in foreign exotic locations? $2 million. $2 million. I feel when I'm saying that I'm some sort of '70s super villain asking for a ransom. I picture Scrooge McDuck swimming through his vast fortune. All the while, her daughter is being married in her living room in jeans and a tank top. So did Alicia Ether take the money or steal for herself? Or did Alicia Ether take money, the money was taken, was it dispensed as directed by and to John Douglas Jones? That's the question you really need to answer.

Trial Tr. [ECF No. 10-1] at 921–22. In its Postconviction Response, the State argued (in a position we presume the postconviction court adopted): "Defense counsel's strategy was the defendant took the money, but she was not guilty of theft as she was directed to do so by the victim." State's Postconviction Response [ECF No. 9-1] at 139.

To prove grand theft in Florida, the State must show that the defendant: "(1) knowingly (2) obtain[ed] or us[ed], or endeavor[ed] to obtain or use, property of another (3) with intent to deprive the person of a right to the property or a benefit therefrom, or to appropriate the property to one's own use." *Pizzo v. State*, 945 So. 2d 1203, 1207 (Fla. 2006) (citing FLA. STAT. § 812.04(1)). In our case, the State had plenty of evidence that Ether transferred large sums of money from Sixth Star's bank accounts to herself. *See* Summary of Transfers [ECF No. 9-1] at 250–85. Given this overwhelming proof that Ether had taken the money, defense counsel came up with a clever strategy: concede the elements the State had *already* proven anyway—namely, the taking of Sixth Star's money—and dispute the element as to which the State could muster only circumstantial proof: Ether's intent. This strategy also had the welcome advantage of explaining away another of the defense's major problems: what to do with Jones's testimony? Jones, remember, was Ether's boss, and he testified unequivocally that Ether stole his company's money. Why should the jury disbelieve him? Herein lies the brilliance of counsel's plan: You, jurors, should disbelieve Jones *precisely* because, as the State has shown, Ether— a loyal employee to the end—transferred the money out of Sixth Star's accounts. How does this make sense? Here's how counsel explained it during his closing:

> And Doug Jones is going to sit there on the stand and tell you, I was in the dark, I didn't have a clue what was going on with my finances. . . . Every check that was stamped and cashed was approved by him.
>
> [. . . .]
>
> Alicia is guilty of helping her employer, John Douglas Jones, attempt to evade paying his taxes. . . . She is guilty of helping her employer hide income. She is not guilty of theft, not over $100,000, not of $20,000. She's not guilty of theft because Doug Jones had his eye on the books the entire time.

Trial Tr. [ECF No. 10-1] at 936, 938–39. Again, brilliant. Ether (counsel was saying) was guilty of *some* crime—just not the crime she was charged with. And Jones was so quick to point the finger at her (counsel cleverly argued) to cover up the fact that she was executing *his* tax-evasion scheme.

Now, the jury didn't buy it. But that doesn't render counsel's sleight of hand ineffective. *See Darden v. United States*, 708 F.3d 1225, 1230–31 (11th Cir. 2013) ("In some cases a trial attorney may find it advantageous to his client's interests to concede certain elements of an offense or his guilt of one of several charges." (quoting *United States v. Swanson*, 943 F.2d 1070, 1075–76 (9th Cir. 1991)); *Sullivan v. Jones*, 2015 WL 4756190, at *35 (N.D. Fla. Aug. 11, 2015) ("To retain credibility, defense counsel must often make concessions that, viewed narrowly, may appear detrimental to the client's cause."). Nor did counsel's "failure to consult and obtain consent" from Ether to pursue this trial strategy somehow transform this otherwise-reasonable decision into a "presumptively prejudicial" error. *Darden*, 708 F.3d at 1233; *see also Florida v. Nixon*, 543 U.S. 175, 186–87 (2004) (holding that "counsel's failure to obtain the defendant's express consent to a strategy of conceding guilt in a capital trial" isn't *per se* ineffective unless the *decision itself* clearly falls short of the *Strickland* standard). To the contrary, counsel came up with one of the only strategies (perhaps the only strategy) that gave Ether some chance of winning. Since counsel wasn't ineffective—and because the trial strategy didn't fall short of the *Strickland* standard—we deny Ground Ten.

### K.  Ground Eleven

In Ground Eleven, Ether rebukes her lawyer for not objecting to several comments the prosecutor made in closing argument—comments Ether now characterizes as prosecutorial misconduct. These include: "instructing the jury they did not need to spend time reviewing the actual evidence"; "manipulat[ing] testimony"; "misstating evidence to elicit sympathy from the jury"; "mischaracterizing the Defendant as [a type] of magician"; "using the Defendant's daughter to denigrate the Defendant"; "inflict[ing] personal opinions of the evidence and repeatedly inflam[ing] the jury"; and "improperly shift[ing] the burden of proof." Petition at 18. The Respondent advances two counterarguments. *First*, again, it characterizes this claim as "conclusory and vague and [ ] insufficient to state a claim warranting relief." Response at 32. *Second*, it contends that these statements didn't prejudice Ether because "the effect on the jury['s verdict] would have been exactly the same"—*i.e.*, that the statements had no "reasonable probability" of affecting the outcome. *Id.*; *see also Strickland*, 466 U.S. at 694 ("The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

"[A] prosecutor's improper comments will be held to violate the Constitution only if they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Parker v. Matthews*, 567 U.S. 37, 45 (2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)). In our case, the state court adopted the State's Postconviction Response, which insisted that "the prosecutor did not misstate any facts during closing, did not vouch for the credibility of any witnesses, did not solicit sympathy from the jury, and did not offer personal opinions of the government." State's Postconviction Response [ECF No. 9-1] at 140. As we've explained, Ether has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). She doesn't come close.

Instead, again, she simply reiterates the same conclusory arguments she pushed in the state court—without ever telling us what the prosecutor's statements were or how they were improper. *See* Petition at 18 (alleging "prosecutorial misconduct" without citing what the prosecutor said at trial); Reply at 7 ("Petitioner's right[ ] to a fair trial [was] decimated by the prosecution's inflammatory, directive [sic], improper and personal statements which denied her a fair trial."). And it's not our job to make arguments for her. *See GJR Invs., Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1369 (11th Cir. 1998) ("Yet even in the case of *pro se* litigants this leniency does not give a court license to serve as *de facto* counsel for a party, or to rewrite an otherwise deficient pleading in order to sustain an action." (cleaned up)).

In any event, we've reviewed the prosecutor's closing argument and can find no support for Ether's claims. Indeed, the prosecutor never—so far as we can tell—injected sympathy or personal opinions into his argument, twisted or manipulated the evidence unfairly, asked the jurors to disregard the evidence, or otherwise shifted the burden. Because the prosecutor didn't do the things Ether claims she did, we can't fault counsel for not objecting at closing argument.

We add only (again) that counsel's decision to object—or not object—is quintessentially the sort of strategic choice we're loath to disturb on collateral review. *See Fugate*, 261 F.3d at 1223–24 ("In evaluating counsel's performance, we always avoid second guessing with the benefit of hindsight and allow lawyers broad discretion to represent their clients by pursuing their own strategy. . . . [B]ecause Bellury's failure to object was strategic, there was no ineffective assistance of counsel." (cleaned up)). And with good reason: Even if the prosecutor's statements *had been* improper, a good lawyer might justifiably suppose that there's little to be gained from objecting. An objection, after all, might suggest to the jury that what the prosecutor just said was harmful to the defense—even if it really wasn't. And this harmfulness (in turn)—coupled with the defensive objection—might indicate to the jury that counsel was objecting, not so much because the argument was improper, but because he wanted to

hide something from the jurors. This is particularly true when one considers the reality that most judges, rightly or wrongly, are reluctant to sustain objections during closing argument. So, a seasoned lawyer might forego the objection—an objection he might well believe the judge would overrule in any case—in order to avoid the dual implication that the State was onto something and that, whatever that harmful thing was, Ether was trying to hide it. *See Brewster v. Hetzel*, 913 F.3d 1042, 1057 (11th Cir. 2019) ("Of course, counsel can for reasonable strategic reasons refrain from making a valid objection or moving for relief their client is entitled to if there are reasonable strategic reasons for not objecting or moving."); *Brown v. Dixon*, 2022 WL 1197657, at *13 (S.D. Fla. Mar. 15, 2022) (Altman, J.) ("[I]n these circumstances, we agree with counsel that it was far better to move on without fanfare or further elaboration. As the Third Circuit explained in a similar context, 'a skilled defense counsel may not have objected or requested a curative instruction in order to avoid highlighting [the witness's] testimony.'" (quoting *Jackson v. Carroll*, 161 F. App'x 190, 194 n.3 (3d Cir. 2005))). Ground Eleven, in other words, is denied.

### L.  Ground Twelve

Ground Twelve is frivolous. In it, Ether excoriates counsel for "fail[ing] to object to or move to recuse the trial court judge who's [sic] deep seated favoritism for the prosecution permeated the proceeding." Petition at 19. In support of this contention, Ether sets out a long litany of the judge's unfavorable rulings, all of which (Ether claims) evince the court's "bias and vindictiveness" against her. *Id.* These include:

> [B]arring defense admission of exculpatory emails "not authored by the defendant"; failed to rule on multiple defense objections and a motion to strike; threatened and pressured voluntary defense witness Charmaine Levy; impeded witness testimony; prevented impeachment of State witnesses; failed to instruct the jury how a "Court exhibit" should be considered; sustained State objections; overruled defense objections; accepted manipulated testimony as fact; admitted an incomprehensible summary over defense objection as competent evidence to impose sentence and restitution; explicit reliance on a software program "Quickbooks" as the forensic accountant; misstating testimony while expressing her opinion and imposing a

> sentence of 25 years . . . and announcing [the] sentence as though Defendant was not present in the courtroom[.]

*Id.* The state postconviction court adopted the State's Postconviction Response, which argued that "[a]ll of the defendant's complaints of bias against the trial judge involve the judge making adverse rulings against the defendant." State's Postconviction Response [ECF No. 9-1] at 141.

In Florida, a motion to disqualify a trial judge will be denied unless the movant "set[s] forth all specific and material facts upon which the judge's impartiality might be questioned." FLA. R. GEN. PRAC. & JUD. ADMIN. 2.330(e). These "specific and material facts" must show that "the [moving] party reasonably fears that he or she will not receive a fair trial or hearing because of the specifically described prejudice or bias of the judge." *Id.* The likelihood of judicial bias must be so "objectively reasonable" that the movant would "have a well-founded fear that he or she will not receive a fair trial." *Parker v. State*, 3 So. 3d 974, 982 (Fla. 2009); *see also In re Walker*, 532 F.3d 1304, 1310–11 (11th Cir. 2008) ("The standard [for recusal] is whether an objective, fully informed lay observer would entertain significant doubt about the judge's impartiality." (cleaned up)). "The fact that the judge has made adverse rulings in the past against the defendant . . . [is] generally considered [a] legally insufficient reaso[n] to warrant the judge's disqualification." *Rivera v. State*, 717 So. 2d 477, 481 (Fla. 1998); *see also Liteky v. United States*, 510 U.S. 540, 555 (1994) ("[J]udicial rulings alone almost never constitute a valid basis for a bias or partiality motion. . . . [T]hey are proper grounds for appeal, not for recusal."). Bias and prejudice will be imputed to the judge only if there is evidence that he "prejudged" the case. *See Liteky*, 510 U.S. at 555 ("[J]udicial remarks . . . that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They *may* do so if they reveal an opinion that derives from an *extrajudicial* source; and they *will* do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible." (emphases in original)).

Ether doesn't come close to meeting this high bar. She never alleges that the trial court "prejudged" her case; she never suggests that the judge's decisions "derive[d] from an extrajudicial source"; and she never demonstrates "such a high degree of favoritism or antagonism as to make fair judgment impossible." *Liteky*, 510 U.S. at 555. She, instead, simply lays out a series of unfavorable rulings she now takes issue with. That just isn't enough.

In her Reply, Ether (for the first time) speculates that the judge's perceived bias might have arisen from the victim's "notoriety" in the community—whatever that means. Reply at 7. Two issues with this. *One*, we don't consider arguments a party makes for the first time only in reply. *See In re Egidi*, 571 F.3d 1156, 1163 (11th Cir. 2009) ("Arguments not fully presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). *Two*, this allegation—that the victim was, for mysterious reasons, "notorious," that the judge knew about his notoriety, and that the judge acted on that knowledge—is precisely the kind of multi-layered speculation that doesn't warrant relief in federal court. *See United States v. Cerceda*, 188 F.3d 1291, 1293 (11th Cir. 1999) ("Recusal cannot be based on unsupported, irrational or highly tenuous speculation." (cleaned up)). Since Ether has failed to show that "the judge's actions created a sufficient concern about [her] impartiality that counsel should have moved to disqualify [her]," *Cabriano v. State*, 325 So. 3d 78, 80 (Fla. 4th DCA 2021), we deny Ground Twelve.

## M. Ground Thirteen

Ground Thirteen advances a claim of cumulative error. *See* Petition at 20 ("The separate and continual failures, errors, and misconducts of the attorneys and trial court pervaded the proceedings which separately and collectively violated the Petitioner's constitutional rights[.]"). Cumulative error occurs when "an aggregation of non-reversible errors . . . can yield a denial of the constitutional right to a fair trial." *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012). Because Ether has failed to show that counsel committed *any* errors, her cumulative-error claim necessarily fails. *See id.*

("None of [the petitioner's] individual claims of error or prejudice have any merit, and therefore we have nothing to accumulate.").

## EVIDENTIARY HEARING

We won't hold an evidentiary hearing in this case. "[W]hen the state-court record 'precludes habeas relief' under the limitations of § 2254(d), a district court is 'not required to hold an evidentiary hearing.'" *Pinholster*, 563 U.S. at 183 (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)). Because we have a robust state trial record, the claims we resolved under § 2254(d) require no factual development. *See Williams*, 529 U.S. at 444 ("The Court of Appeals rejected this claim on the merits under § 2254(d)(1), so it is unnecessary to reach the question whether § 2254(e)(2) would permit [or restrict] a hearing on the claim.").

## CERTIFICATE OF APPEALABILITY

A Certificate of Appealability ("COA") is appropriate only when the movant makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To deserve a COA, therefore, the movant must show that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Reasonable jurists wouldn't find our resolution of the Petition's constitutional claims debatable or wrong. We thus **DENY** any request for a COA.

***

Having thoroughly reviewed the record and the governing law, we hereby **ORDER AND ADJUDGE** that the Petition is **DENIED**, a certificate of appealability is **DENIED**, an evidentiary hearing is **DENIED**, and all deadlines are **TERMINATED**. Any pending motions are **DENIED** as moot. The Clerk of Court shall **CLOSE** this case.

**DONE AND ORDERED** in the Southern District of Florida, this 3rd day of June 2022.

**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:    Alicia Ether, *pro se*
       counsel of record